**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STANFORD MILLER, CESAR SALAS VALDEZ, FABION LEWIS, and GEORGE NUMFOR, on behalf of themselves and all others similarly situated, | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | **Jury Trial Demanded** |
| v. | **Case No. 23-cv-65** |
| CITY OF NEW YORK and DAVID DO, in his official capacity as Commissioner of the New York City Taxi and Limousine Commission, | |
| Defendants. | |

PLAINTIFFS STANFORD MILLER, CESAR SALAS VALDEZ, FABION LEWIS, and

GEORGE NUMFOR, on behalf of themselves and all others similarly situated, through counsel,

allege as follows against Defendants City of New York and David Do, in his official capacity as

Commissioner of the New York City Taxi and Limousine Commission ("TLC"):

## INTRODUCTION

1.      The Plaintiffs bring this proposed class action seeking declaratory, injunctive, and

monetary relief to remedy deprivations of their rights under the United States Constitution.

2.      Under the guise of public safety, the TLC has long engaged in a pattern and practice

of utilizing undercover TLC inspectors ("decoys") to run sting operations at LaGuardia Airport

and John F. Kennedy Airport ("JFK Airport"), as well as at other locations across New York City.

These operations are designed to entrap innocent individuals into violations of N.Y.C. Admin.

Code § 19-506(b) (the "Street Hail Law"), which, *inter alia*, prohibits street hails without the

appropriate TLC license and penalizes the drivers and owners of the vehicles who allegedly

1

violated the law.  Almost all violations of the Street Hail Law result in a penalty of $1,500 for a first offense, and often a 60-day suspension of a driver's license, or $2,000 for a second offense, often with the TLC also seizing the person's vehicle.

3.      The TLC's sting operations primarily target people of color, immigrants, or people with limited English proficiency, many of whom, like the Plaintiffs, have just dropped off their family members or friends (or rideshare passengers who were picked up outside of New York City limits) at the airport.  The TLC decoys entrap drivers by inventing sob stories and begging and groveling for rides, exploiting drivers' compassion and natural inclination to provide mutual aid to other members of their communities, and repeatedly badgering and cajoling drivers who initially reject the decoys' entreaties.

4.      TLC officers often fabricate details in the summonses that they issue to the sting operations targets, including the essential detail that the targets agreed to drive them for some amount of money, or, at best, the officers misunderstand their conversations with drivers who have limited English proficiency or who speak English with heavy non-American accents.  Moreover, contrary to the TLC's own internal guidance that spans a single page, decoys often succeed in manufacturing violations of the Street Hail Law only after persistently and incessantly begging or harassing drivers.  Even where people targeted in these operations do not agree to drive the decoy anywhere, much less for money, TLC inspectors will still issue them a summons for violating the Street Hail Law.

5.      The TLC operates this abusive entrapment scheme as a revenue-raising operation on the backs of low-income New Yorkers who can least afford to fill the TLC's coffers.  Since 2017, the TLC has collected over $5 million from individuals for Street Hail Law violations, while issuing summonses with a face value of more than triple that amount.  Because of this scheme,

ordinary New Yorkers who set out to drop off family members or friends at the airport to catch a flight and who have no motive or interest in violating the law or predisposition to do so often leave the airport with a summons to pay a $1,500 civil penalty.

6.      The Street Hail Law civil penalties imposed by the TLC through this entrapment scheme violate the Eighth Amendment to the United States Constitution, which prohibits the government, here the City of New York, from imposing "excessive fines" on individuals.  Because the fines imposed through the TLC's undercover sting operations are punitive and bear no relationship to the alleged harm caused by these violations or the stated purposes of the Street Hail Law, they violate the Excessive Fines Clause of the Eighth Amendment.

7.      The civil penalties at issue in this case are unquestionably fines or punishments within the meaning of the Eighth Amendment, because they serve a deterrent purpose.

8.      Street Hail Law violations were initially punishable by a fine of $200 to $500 after a criminal court conviction.  But the City of New York and the TLC have sharply raised the financial penalty, while lowering the bar for imposing the fines by permitting administrative prosecutions before the New York City Office of Administrative Trials and Hearings ("OATH"), rather than through criminal trials.  *See* N.Y.C. Admin. Code § 19-506(e)(1)-(3).

9.      In 2012, New York City increased the civil penalty for a first violation by more than a factor of seven—increasing the minimum fine for a first offense from $200 to $1,500. The City's justification for raising the minimum civil penalty amount from $200 to $1,500 primarily rested on so-called public safety concerns and a desire to deter unregulated and unlicensed drivers from engaging in human trafficking.

10.     But the TLC's airport sting operations, targeting individuals who have just dropped off family members or friends, who have no predisposition to engage in an unlicensed street hail, and whose violations are unconnected to any other criminal activity, fail to serve these ends.

11.     For these reasons, the fines resulting from TLC's abusive undercover sting operations are grossly disproportional and bear no relationship to the alleged harms, causes, or stated purposes of the Street Hail Law.

12.     Through this scheme, the City of New York has reaped more than $5 million in revenues since 2017, extracting punitive payments from thousands of drivers and vehicle owners who have been unfairly and improperly subjected to the City's unconstitutionally excessive fines.

## JURISDICTION AND VENUE

13.     The Court has subject matter jurisdiction over Plaintiffs' federal claim under 28 U.S.C. § 1331.  Plaintiffs' federal law claim arises under 42 U.S.C. § 1983 and the United States Constitution.

14.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), because the Defendants are subject to personal jurisdiction in this District and because a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this District.  Both JFK Airport and LaGuardia Airport, the airports where the TLC primarily conducts its sting operations and where Plaintiffs and members of the class were aggressively solicited by undercover TLC officers, are located in this District.

## PARTIES

15.     Plaintiff Stanford Miller is a resident of Queens County, New York.  Mr. Miller received a summons for an alleged violation of N.Y.C. Admin. Code § 19-506(b)(1) stemming from a TLC undercover decoy operation.

16.     Plaintiff Cesar Salas Valdez is a resident of Bronx County, New York.  Mr. Valdez received a summons for an alleged violation of N.Y.C. Admin. Code § 19-506(b)(1) stemming from a TLC undercover decoy operation.

17.     Plaintiff Fabion Lewis is a resident of Queens County, New York.  Mr. Lewis received a summons for an alleged violation of N.Y.C. Admin. Code § 19-506(b)(1) stemming from a TLC undercover decoy operation.

18.     Plaintiff George Numfor is a resident of Bronx County, New York.  Mr. Numfor received a summons for an alleged violation of N.Y.C. Admin. Code § 19-506(b)(1) stemming from a TLC undercover decoy operation.

19.     Defendant City of New York ("City") is a municipality duly incorporated pursuant to the laws of the State of New York.  The TLC is an administrative agency of the City, created by New York City Charter § 2300 for the continuance, further development, and improvement of taxi and limousine service in the City of New York.  The TLC is empowered by the City Charter to act by a majority vote of its members.  In addition to the City Charter, the TLC is governed by the Administrative Code of the City of New York, enacted by the City Council, and by the TLC rules, enacted by a majority vote of the TLC.

20.     Defendant David Do ("Do") is Commissioner and Chair of the TLC. Eight of the nine members of the TLC commission are unsalaried.  Defendant Do, as head of the agency, is the one salaried commissioner and carries executive responsibilities, including implementing and

overseeing the policies of the TLC and ensuring that its personnel obey the Constitution and laws of the United States and the State of New York. Defendant Do is being sued in his official capacity.

## STATUTORY FRAMEWORK

### N.Y.C. Administrative Code § 19-506(b)

21.     In New York City, the Street Hail Law makes it unlawful to knowingly operate or allow another to operate a vehicle for hire without the appropriate license to do so from the TLC. Subsection (b)(1) of the Street Hail Law provides that "any person who shall permit another to operate or who shall knowingly operate or offer to operate for hire any vehicle as a taxicab, coach, wheelchair accessible van, commuter van, HAIL vehicle or for-hire vehicle in the city, without first having obtained or knowing that another has obtained a license for such vehicle . . . shall be guilty of a violation." N.Y.C. Admin. Code § 19-506(b)(1).

22.     A violation of subsection (b)(1) may be enforced in criminal court, punishable upon conviction by a fine of $1,000 to $2,000 or up to a 60-day term of imprisonment, or both. *Id.*

23.     Alternatively, or additionally, a violation of subsection (b)(1) may be subject to a civil penalty of $1,500 for a first violation and $2,000 for a second violation. N.Y.C. Admin. Code § 19-506(e)(1), (e)(3).[1]  In addition to the civil penalty, the second offense also often results in the TLC seizing the person's vehicle. *Id.*

---

[1] N.Y.C. Admin. Code § 19-506(b)(2), by contrast, covers the use of a TLC-licensed vehicle for activity beyond that permitted by the TLC license. For example, if a vehicle has only a for-hire-vehicle ("FHV") license (which permits it to be dispatched by a base such as Uber or Lyft to pick up passengers at a particular location), it may not be used to solicit or accept street hails. The penalties under this section are imposed on the owner of such vehicle, or the operator, if different. *Id.*  The penalty amount under § 19-506(b)(2) ranges from a fine of $400 to $1,000 and imprisonment of up to 60 days, though in practice when prosecuted administratively, the first offense carries a fine of $200 to $1,500. § 19-506(e)(2)-(3).

24.     The TLC is authorized to prosecute civil violations through administrative proceedings and generally elects to do so before OATH.  Guilty violations following OATH hearings may be enforced as if they are money judgments.  N.Y.C. Admin. Code § 19-506(e)(1).

25.     In 1989, the New York City Council doubled the range of fines for unlicensed operation for hire, from a prior range of $200 to $500 to a new range of $400 to $1,000, while maintaining the penalty of up to 60 days of imprisonment.  N.Y.C. Local Law No. 87 of 1989, Council Int. No. 541-A, § 1 (Nov. 17, 1989).  The City Council also empowered the TLC to utilize seizure and forfeiture of unlicensed vehicles.  N.Y.C. Local Law No. 90 of 1989, Council Int. No. 957-A, § 1 (Nov. 22, 1989).  The increased penalties were imposed to "reduce the large number of illegally operating vehicles, compel compliance with the commission's licensing and other requirements, and to assure that the public is served by vehicles meeting the legal requirements for service, safety and insurance." *Id.*

26.     In 1992, the City Council imposed an alternative civil penalty range for unlicensed operation for hire of $100 to $500.  N.Y.C. Local Law No. 12 of 1992, Council Int. No. 738-A, § 3 (Jan. 8, 1992).

27.     In 1996, the City Council increased the range of civil fines for unlicensed operation for hire to $200 to $1,500.  N.Y.C. Local Law No. 51 of 1996, Council Int. No. 347-A, § 3 (June 21, 1996).

28.     In 2012, City Council again increased the range of criminal fines for unlicensed operation for hire to $1,000 to $2,000 and increased the civil penalties for the same violations to the current penalties—$1,500 for a first violation and $2,000 for a second violation.  N.Y.C. Local Law No. 32 of 2012, Council Int. No. 735-A, §§ 2-3 (June 20, 2012).  The penalties were purportedly raised to "crack[] down on an illegal segment of the for-hire industry in general" and

to address broader concerns about sex trafficking, an industry that "flourishes on, even relies upon, the use of both legal and illegal for-hire vehicles."[2]

29.     Despite the TLC's general election to seek civil penalties via OATH, the statute still carries the penalty of potential imprisonment for a period of up to 60 days.  N.Y.C. Admin. Code § 19-506(b)(1).

30.     A violation of § 19-506(b)(1) may also result in a 60-day suspension of the driver's New York State Department of Motor Vehicles license.  N.Y. Veh. Traf. Law § 510(2-a)(a). Drivers of means may pay a $50 termination fee to clear the suspension prior to the close of the 60-day period.  *Id*. § 503(2)(j).

## FACTUAL ALLEGATIONS

**Plaintiff Stanford Miller**

31.     Mr. Miller is a 49-year-old Black, Jamaican-American resident of Queens, New York.

32.     Mr. Miller works in the construction and food service industry.

33.     On or about August 17, 2021, Mr. Miller dropped off two family members at JFK Airport.  After the family members exited the vehicle, Mr. Miller was approached by an unknown woman who asked Mr. Miller where he was going. When Mr. Miller said he was going to Queens, the woman asked for a ride.  Mr. Miller noticed that this woman appeared older, seemed desperate for a ride, and was struggling with her luggage.  Because he felt sympathy for the woman and

---

[2] Hearing on Proposed Int. 0735-2011 and 0725-2011 by Committees on Transportation & Women's Issues at 6:5-7; 8:23-25, 9:2-3. (Dec. 14, 2011), *available at*: https://legistar.council.nyc.gov/View.ashx?M=F&ID=1691952&GUID=57C64EC0-FC92-429C-9B20-609D13FB4005.

because he was already driving back to Queens—the woman's purported destination—Mr. Miller agreed to drive her.

34.     Mr. Miller did not request or accept any payment in exchange for driving the woman to Queens.

35.     The woman who approached Mr. Miller and initiated the conversation was, in fact, TLC Officer Rosiana Hinds, an undercover decoy.  Although Mr. Miller did not accept or request any payment for a ride, Officer Hinds claimed that Mr. Miller agreed to drive her to her requested destination for a $40 fare.

36.     Officer Hinds issued Mr. Miller a summons for operating for hire without the required TLC license in violation of N.Y.C. Admin. Code § 19-506(b)(1).  The TLC elected to administratively prosecute this summons before OATH.

37.     Mr. Miller had never received a Street Hail Law summons before.

38.     The summons stated on its face that the maximum penalty was $2,000.

39.     On or about November 22, 2021, Mr. Miller challenged the summons at a hearing before OATH without the benefit of any recording (whether audio or video) of the operation or any third-party witnesses.  The OATH hearing official considered the testimony of Mr. Miller and Officer Hinds and ruled in favor of the TLC.

40.     The TLC imposed a $1,500 fine against Mr. Miller for the alleged violation of the Street Hail Law.

41.     This single incident for which Mr. Miller received a fine is the only time that Mr. Miller is alleged to have violated the Street Hail law.  Neither the TLC nor the City has alleged that Mr. Miller's single alleged violation of the Street Hail law was connected to any other crime or criminal activity.

**Plaintiff Cesar Salas Valdez**

42.     Mr. Valdez is a 42-year-old Latino-American resident of the Bronx, New York. Mr. Valdez's primary spoken language is Spanish.  He has limited English proficiency.

43.     Mr. Valdez works as a building superintendent.

44.     On or about July 19, 2022, Mr. Valdez dropped off his father at JFK Airport.  After his father exited the vehicle, Mr. Valdez was approached by an unknown man who asked if he was a taxi driver.  The man spoke to Mr. Valdez in a mix of English and fragmented Spanish.  Mr. Valdez repeatedly confirmed that he was not operating a taxi.

45.     Mr. Valdez was eager to return to his building in the Bronx where electricians were remedying a power outage.  After Mr. Valdez explained that he needed to return to the Bronx, the man claimed he needed a ride to Yankee Stadium—which is located in the Bronx—and insisted that Mr. Valdez give him a ride there.  The man would not leave Mr. Valdez alone, repeatedly cajoling and attempting to guilt him until Mr. Valdez finally relented and offered to drive the man.

46.     Mr. Valdez agreed to provide a ride in exchange for payment only after the man badgered him and eventually wore Mr. Valdez down.

47.     The man who approached Mr. Valdez and initiated the conversation was, in fact, TLC Officer Manuel Chuva Galarza, an undercover decoy.  Officer Chuva Galarza claims that Mr. Valdez offered to drive him to the Bronx for $60.

48.     Officer Chuva Galarza issued Mr. Valdez a summons for operating for hire without the required TLC license in violation of N.Y.C. Admin. Code § 19-506(b)(1).  The TLC elected to administratively prosecute this summons before OATH.

49.     Mr. Valdez had never received a Street Hail Law summons before.

50.     The summons stated on its face that the maximum possible penalty was $2,000.

51.     On or about November 22, 2022, Mr. Valdez settled the summons with the TLC for $500 to avoid the time and stress of an OATH hearing and the risk of the maximum penalty being imposed against him.

52.     This single incident for which Mr. Valdez received a fine is the only time that Mr. Valdez is alleged to have violated the Street Hail Law.  Neither the TLC nor the City has alleged that Mr. Valdez's single alleged violation of the Street Hail Law was connected to any other crime or criminal activity.

**Plaintiff Fabion Lewis**

53.     Mr. Lewis is a 38-year-old Black, Jamaican-American resident of Queens, New York.

54.     Mr. Lewis is currently a TLC-licensed Uber driver and runs his own small business.

55.     On or about January 5, 2020, Mr. Lewis dropped off an Uber passenger from Westchester County at JFK Airport.  Before he was able to pull away from the curb and leave the airport, an unknown Black man approached Mr. Lewis.  The man, who appeared to speak with a Haitian accent, was accompanied by an unknown Black woman.  Neither the man nor the woman was wearing a jacket, despite it being a cold day in January.  The man claimed that he and his wife were stranded at the wrong airport and needed a ride to LaGuardia Airport to catch their flight.  Mr. Lewis declined to help them and explained to the couple that he could receive a TLC fine if he picked them up without the trip being pre-arranged through Uber.  The man insisted that Mr. Lewis would not receive a fine because Mr. Lewis is an Uber driver.  Mr. Lewis stood firm and explained again that he was prohibited from picking up passengers at JFK Airport without a TLC license that permits the operator to accept street hails.

56.     Mr. Lewis then rolled up his car windows so that he could leave but the stranger continued to plead for Mr. Lewis' help.  Mr. Lewis felt compassion for the couple, whom he believed were stranded at JFK Airport without winter jackets in January and desperately feared missing their flight.  Mr. Lewis finally relented and agreed to drive the couple to LaGuardia; he opened his trunk for their luggage, and they entered his vehicle. Almost immediately after, a uniformed TLC officer appeared and issued Mr. Lewis a Street Hail Law summons.

57.     Mr. Lewis only agreed to drive the couple because the man had begged and pleaded for a ride, despite Mr. Lewis' multiple refusals.

58.     The individuals who approached Mr. Lewis were, in fact, undercover TLC officers, whose names are unknown to the Plaintiffs.  The TLC officer who issued the summons, Officer Gurjeet Sahota, claimed in the summons to have observed Mr. Lewis open his trunk for the undercover officers' luggage and allow the undercover officers to enter his vehicle.  Officer Sahota also claimed in the summons that according to his undercover colleague, Mr. Lewis agreed to drive the couple to LaGuardia Airport for $50.

59.     Although Officer Sahota did not personally witness Mr. Lewis agree to drive the undercover officers for payment, he issued Mr. Lewis a summons for operating for hire without the required TLC license in violation of N.Y.C. Admin. Code § 19-506(b)(1).  The TLC elected to administratively prosecute this summons before OATH.

60.     Mr. Lewis had never received a Street Hail Law summons before.

61.     The summons stated the maximum possible penalty was $2,000.

62.     On or about November 19, 2020, Mr. Lewis settled the summons with the TLC for $500 to avoid the time and stress of an OATH hearing and the risk of the maximum penalty being imposed against him.

63. This single incident for which Mr. Lewis received a fine is the only time that Mr. Lewis is alleged to have violated the Street Hail Law. Neither the TLC nor the City has alleged that Mr. Lewis' single alleged violation of the Street Hail Law was connected to any other crime or criminal activity.

**Plaintiff George Numfor**

64. Mr. Numfor is a 41-year-old African-American resident of the Bronx, New York.

65. Mr. Numfor currently holds a for-hire-vehicle license with the TLC, which permits him to be dispatched by a base in New York City (*e.g.*, an Uber or Lyft or a black car base) to pick up passengers. At the time of the incident described below, however, Mr. Numfor had not yet obtained a TLC license.

66. On or about March 1, 2022, Mr. Numfor picked up an Uber passenger in Westchester County and dropped the passenger off at JFK Airport. After the passenger exited the vehicle, Mr. Numfor was approached by an unknown man who asked Mr. Numfor if he was a taxi driver. Mr. Numfor explained he was not a taxi driver or otherwise licensed by the TLC. The individual nonetheless insisted on a ride to LaGuardia Airport.

67. Mr. Numfor, who speaks English with a pronounced accent, explained that he was legally prohibited from picking up passengers at the airport. At that point, the individual asked if "they" take credit card or cash, which Mr. Numfor understood to be a general question about cabs at the airport. The individual also asked Mr. Numfor how much it would cost to get to LaGuardia Airport from JFK Airport, which Mr. Numfor also assumed was a general informational question, not a specific question about how much Mr. Numfor would charge to drive the man to LaGuardia Airport. To be helpful, Mr. Numfor told him that he estimated that such a ride would be $20 to $30, but advised he was not certain.

68.     Mr. Numfor did not agree to drive this unknown individual, either in exchange for payment or for free.

69.     The man who approached Mr. Numfor and initiated the conversation was, in fact, TLC Officer Hong Liang Luo, an undercover decoy. Although Mr. Numfor did not accept or request any payment for a ride, Officer Luo claimed that Mr. Numfor agreed to drive him for a $30 fare.

70.     Officer Luo issued Mr. Numfor a summons for operating for hire without the required TLC license in violation of N.Y.C. Admin. Code § 19-506(b)(1). The TLC elected to administratively prosecute this summons before OATH.

71.     Mr. Numfor had never received a Street Hail Law summons before.

72.     The summons stated on its face that the maximum possible penalty was $2,000.

73.     On or about April 11, 2022, Mr. Numfor settled the summons with the TLC for $500 to avoid the time and stress of an OATH hearing and the risk of the maximum penalty being imposed against him.

74.     This single incident for which Mr. Numfor received a fine is the only time that Mr. Numfor is alleged to have violated the Street Hail Law. Neither the TLC nor the City has alleged that Mr. Numfor's single alleged violation of the Street Hail Law was connected to any other crime or criminal activity.

**TLC's Revenue-Raising Entrapment Scheme**

75.     Since January 1, 2020, the TLC has imposed more than $8 million in civil penalties from approximately 5,500 summonses issued for alleged violations of the Street Hail Law and has collected at least $1 million in revenue from such alleged violations.

76.     More than 50% of these Street Hail Law summonses were issued in and around JFK and LaGuardia Airports, generating close to $5 million in civil penalties imposed and approximately $700,000 in revenue collected. The TLC relies on undercover sting operations using decoys to generate the vast majority of these alleged Street Hail Law violations in and around JFK and LaGuardia Airports, and accordingly, the majority of its revenue from alleged Street Hail Law violations derives from such undercover operations.

77.     The TLC claims that it utilizes undercover decoy or street hail operations "to detect drivers who are ready, willing and able to commit street hail violations [under § 19-506(b)]."

78.     The TLC claims that it instructs its officers not to be "overly persuasive, pre-emptive, or pressuring when acting as decoys." Specifically:

> [i]f a driver refuses an inspector's street hail solicitation, there should be no further attempts to engage the driver in for-hire activity. Inspectors should not resort to persuasive or pre-emptive tactics such as begging, pleading, crying, offering an unusually high fare, putting luggage on or in the vehicle, etc. in order to entice a driver to accept a street hail that he/she otherwise would not have accepted. Inspectors should merely provide drivers with an opportunity to commit a street hail violation—not convince them to commit one.

79.     But the TLC's claims that its undercover operations are intended to detect legitimate ride hailing violations and that its officers should not pressure individuals to commit ride hailing violations are a cruel farce.

80.     Undercover TLC officers explicitly, intentionally, and routinely utilize every possible "persuasive and pre-emptive tactic[]" to manufacture Street Hail Law violations, either by aggressively convincing the driver to commit the violation or by simply fabricating details, particularly the agreement to drive an undercover decoy for a specific amount of money, that establish the basis for the violation.

81.     The TLC's primary motivation for engaging in this pattern and practice of manufacturing Street Hail law violations is its own revenue generation, as opposed to detecting people who seek to operate unlicensed vehicles for hire or are engaged in related criminal activities like human trafficking.

82.     After receiving a Street Hail Law summons, drivers and vehicle owners ("respondents") lack any meaningful opportunity to contest the summonses and avoid the hefty civil penalties.  Respondents who seek to challenge Street Hail Law summonses before OATH must do so without an objective record of the incident, since the TLC has a policy of not requiring its inspectors to record undercover operations, even with audio.  And OATH has determined, as a matter of law, that the defense of entrapment is unavailable to contest Street Hail Law summonses.

83.     The record before OATH is, therefore, generally limited to the TLC inspectors' subjective and self-serving version of how the unlawful agreement to allegedly drive for money was reached.  Not surprisingly, even where a respondent contests the factual allegations in the summons—contending, for example, that no agreement to drive for money was reached, or that they were willing to drive the decoy for free because they felt compassion or pity for the decoy or because the decoy begged and groveled incessantly,[3] and even where a respondent may have a corroborating witness—OATH generally accepts the TLC's testimony as more credible.

84.     Because challenging a Street Hail Law summons is nearly impossible for drivers and vehicle owners, and because the maximum penalties are so high, respondents often feel pressure to settle such violations with the TLC even if they did not commit the alleged violation

_____

[3] Driving another for free does not fall under the scope of the Street Hail Law.  *See* N.Y.C. Admin. Code § 19-506(b)(1) ("any person who shall permit another to operate or who shall knowingly operate . . . *for hire* any vehicle as a taxicab . . . ."); (b)(2) ("any person who shall permit another to operate or who shall knowingly operate . . . *for hire* any vehicle licensed as a taxicab . . . ."). No other New York City statute prohibits driving another person for free.

or were entrapped into doing so. Many respondents agree to settle with the TLC to avoid the stress, time, and resources needed to challenge the TLC's summonses, and because they fear that any challenge will be unsuccessful and result in liability for the maximum penalty amount.

85.    As a result of TLC's aggressive undercover sting operations, the lack of meaningful due process for respondents to challenge them, and the potential penalty of $1,500 for a first violation, the TLC can expect to recoup at least $500 for each Street Hail Law violation that it generates through undercover sting operations.

86.    The TLC generally does not settle with respondents for less than $500, no matter the specific circumstances, and offers payment plans intended to help ease the burden of the penalty only to TLC-licensed drivers. If the respondent does not settle and either defaults or loses at a hearing, the TLC seeks to collect the full $1,500 for a first offense or the full $2,000 for a second offense.

## CLASS ALLEGATIONS

87.    The named Plaintiffs bring this action as a proposed class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class (collectively, "Class Members" or "Class"):

> All individuals who, from three years before the filing of this Complaint through the date of trial, have received a summons for a violation of N.Y.C. Admin. Code § 19-506(b)(1) or (b)(2) through a TLC operation that uses a decoy or undercover officer, and have (a) had a fine of $1,500 to $2,000 imposed upon them after a hearing or default, or (b) paid or agreed to pay a fine of at least $200 to settle such a violation.

88.    The Class Members are so numerous that joinder of all members is impracticable. Since January 1, 2020, the TLC has issued approximately 5,500 summonses for violations of § 19-506(b)(1) or (b)(2), with at least 3,200 of those summonses issued in or around JFK and LaGuardia

Airports. Based upon FOIL data produced by the TLC, the Plaintiffs believe that at least 3,000 of those 5,500 summonses stemmed from undercover sting operations that utilized TLC decoys in which the TLC decoy approached the Class Member and initiated the conversation, as opposed to the driver soliciting the undercover TLC decoy to be a passenger in an unlicensed ride for hire. The Class Members may be notified of the pendency of this action by email and/or mailed notice.

89. There are questions of law and fact common to all Class Members, and these questions predominate over any questions affecting only individual members. Common legal and factual questions include whether:

   a. The Defendants have violated and continue to violate the Excessive Fines Clause of the Eighth Amendment by imposing grossly disproportional fines against drivers and vehicle owners for alleged violations of the Street Hail Law stemming from the TLC's undercover decoy operations;

   b. The Defendants' violations of the Eighth Amendment were willful, reckless, or indifferent;

   c. Injunctive and declaratory relief are warranted regarding the Defendants' conduct;

   d. Compensatory or nominal damages are warranted under 42 U.S.C. § 1983; and

   e. Attorney's fees and costs are warranted under 42 U.S.C. § 1988(b).

90. The Plaintiffs' claims are typical of the claims of the class they seek to represent, because in the relevant period: (1) the Plaintiffs were drivers or owners of vehicles; (2) the Plaintiffs were targeted by TLC officers in undercover decoy operations; (3) the Plaintiffs were approached by undercover TLC officers who initiated any conversation about obtaining a ride; (4) the Plaintiffs were issued a summons for allegedly violating N.Y.C. Admin. Code §19-506(b)(1) or (b)(2); and (5) the Plaintiffs have paid or must pay a civil penalty of at least $1,500 after a hearing or default or have paid or agreed to pay a fine of at least $200 to settle such violation. Accordingly, the Plaintiffs' claims arise from the same pattern or practice or course of conduct

that forms the basis of the Class Members' claims. In addition, the Plaintiffs bring the same Excessive Fines Clause claim based on the same legal theory.

91.     There is no antagonism between the interests of the Plaintiffs and those of the Class Members. The Plaintiffs' injuries, including the excessive fines assessed or paid, and the time and expense of disputing the summonses or settling with the TLC, are injuries similar to the injuries that all of the Class Members have suffered.

92.     The Plaintiffs will fairly and adequately represent the Class.  There is no conflict between the Plaintiffs' claims and those of the Class Members.  The Plaintiffs have retained counsel skilled in complex civil rights class actions who will vigorously prosecute this litigation.

**Rule 23(b)(2) certification is appropriate.**

93.     Class certification is appropriate for the proposed Class under Rule 23(b)(2), because the Defendants have acted or refused to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to the Plaintiffs and the Class. Specifically, the Plaintiffs and the Class Members will seek a declaration that any fine greater than or equal to $200 for an alleged violation of § 19-506(b)(1) or (b)(2), stemming from an undercover decoy operation in which the undercover officers initiate the request for a ride, is unconstitutionally excessive, and they will seek to enjoin the Defendants from issuing any summonses for violations of § 19-506(b)(1) or (b)(2) through an undercover decoy operation with a fine greater than or equal to $200.  In addition, the monetary relief sought by the Plaintiffs and the Class Members is incidental to the declaratory and injunctive relief sought, because the amounts owed to each Class Member can be calculated in a simple, objective, and mechanical manner.

**Rule 23(b)(3) certification is appropriate.**

94.     Class certification is appropriate for the proposed Class under Rule 23(b)(3).  As described above, common questions of fact and law predominate over any questions affecting only individual Class Members, including whether the Defendants violated and continue to violate the Eighth Amendment's Excessive Fines Clause and the relief that the Plaintiffs and the Class Members seek.

95.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  First, the Class Members do not have an interest in individually controlling the prosecution of separate actions, because their individual damages are unlikely to be large enough to warrant pursuing individual litigation in court or to obtain counsel to pursue an individual action, and because the cost of litigating the action will far exceed any potential benefit for individual Class Members.  The prosecution of separate actions by individual Class Members would also impose heavy burdens upon the courts and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the proposed Class, including the key legal question of whether the Defendants are violating the Excessive Fines Clause of the Eighth Amendment.

96.     A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure the uniformity of decision with respect to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  In addition, to date there has not been any litigation by the Class Members regarding the practice challenged in this action.  Finally, there will be no difficulties in managing this case as a class action.

## FIRST CLAIM FOR RELIEF
### (42 U.S.C. § 1983)
### (Violation of the Eighth Amendment to the United States Constitution)

97.     The Plaintiffs, on behalf of themselves and the Class Members, incorporate by reference all proceeding paragraphs.

98.     The Defendants have engaged in a pattern, practice, and/or custom of imposing civil penalties under N.Y.C. Admin. Code § 19-506(b)(1) and (b)(2) in a manner that violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution.[4]

99.     The City of New York and Commissioner Do have violated the Excessive Fines Clause by imposing excessive civil penalties on individuals who were approached or solicited for rides by undercover TLC officers, as part of the TLC's undercover sting operations.

100.    The Eighth Amendment to the United States Constitution provides that "[e]xcessive bail shall not be required, nor excessive fines imposed[.]"

101.    These constitutional provisions prohibit the Defendants from imposing a fine or punishment that is grossly disproportionate to the relevant offense.

102.    The civil penalties imposed for violations of the Street Hail Law are fines or punishments within the meaning of the Excessive Fines Clause, because they serve a deterrent purpose and are not solely intended to serve a remedial purpose. They are referred to as "penalties" in the statute, and the Street Hail Law's legislative history, described above, demonstrates that the large amount of those penalties—and the exponential increase of the minimum civil penalty of

---

[4] Although the Defendants' conduct also violates the analogous Excessive Fines Clause to the New York State Constitution, Art. I, § 5, the Plaintiffs reserve their right to bring such a state constitutional claim as there is no private right of action under the New York State Constitution to the extent the same remedies are available in a section 1983 action challenging an analogous provision of the U.S. Constitution. *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 520 (S.D.N.Y. 2013).

$200 in 2012 to the current minimum civil penalty of $1,500—was intended by the City Council to deter human and sex trafficking and people from driving unlicensed cars for hire.

103. The Defendants have imposed these fines to maximize revenues for the TLC, and not to protect the public.

104. The civil penalties for violating the Street Hail Law are unconstitutionally excessive.

105. In the Second Circuit, a four-part test determines when fines or punishments are unconstitutionally excessive, the so-called "*Bajakajian* factors," which the U.S. Supreme Court set forth in *United States v. Bajakajian*, 524 U.S. 321 (1998). Those factors are (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's Conduct. *See id.* at 337-340; *U.S. v. Viloski*, 814 F.3d 104, 110 (2d Cir. 2016).

106. In this case, each of the *Bajakajian* factors supports the conclusion that the civil penalties the Defendants have imposed on the Plaintiffs and the Class Members violate the Excessive Fines Clause.

107. First, the essence of the Class Members' violations is minor and there is no relation whatsoever between those violations and other criminal activity. The Plaintiffs and the Class Members lacked a predisposition to engage in an unlicensed street hail. Instead, after dropping off family, friends, or rideshare passengers, they merely responded, often in human terms, to aggressive solicitations, deceit, and persuasion from undercover TLC officers who badgered them for rides. The Plaintiffs and the Class Members did not commit these violations in conjunction with any other criminal activities.

108. Second, the Plaintiffs and the Class Members do not fit within the class of people whom the Street Hail Law was principally designed to regulate. The statutory provision and its stiff penalties were intended by the City Council to prevent people from operating unlicensed taxi services without insurance or engaging in unlicensed operation for hire as part of human or sex trafficking schemes. In contrast, the Plaintiffs and the Class Members insured the vehicles they own or drove and were not engaging in or contemplating engaging in human or sex trafficking. The Plaintiffs and Class Members are ordinary people who merely dropped off their friends or family members (or rideshare passengers) at the airport and were solicited by aggressive undercover officers to provide them rides for money.

109. Third, in every case of an alleged Street Hail Law violation, the Defendants have imposed the maximum fine that could have been imposed on the Plaintiffs and the Class Members, which is $1,500 for the first offense and $2,000 for the second offense.

110. Fourth, the Plaintiffs' and Class Members' conduct did not cause harm to anyone. No one experienced physical, personal, or economic harm when the Plaintiffs and the Class Members responded to undercover officers' aggressive requests to provide them rides for money.

111. The City of New York, Commissioner Do, and their agents, including the TLC officers, undertook this pattern, practice, and custom, under the color of law, and caused damages to the Plaintiffs and Class Members by issuing them civil penalties of at least $1,500 for alleged violations of the Street Hail Law.

112. As a direct result of the Defendants' acts and omissions, the Plaintiffs and the Class Members have suffered damages, and/or are entitled to restitution, in an amount to be proven at trial.

113.    The Defendants' actions were deliberate, reckless, and indifferent to the Plaintiffs' and Class Members' constitutional rights.

114.    The Plaintiffs seek their costs and attorney's fees related to this lawsuit and the Defendants' constitutional violations under 42 U.S.C. § 1988.

## PRAYER FOR RELIEF

115.    WHEREFORE, the Plaintiffs and the Class Members pray for relief as follows:

(i)     A declaratory judgment that the Defendants' pattern, practice, or custom violates the Excessive Fines Clause of the Eighth Amendment to the United States Constitution;

(ii)    A preliminary and permanent injunction against the Defendants barring them from imposing penalties equal to or greater than $200 under the circumstances at issue in this case;

(iii)   Certification of the case as a class action under Fed. R. Civ. P. 23(b)(2) and/or (b)(3);

(iv)    Designation of the Plaintiffs as the representatives of the Class;

(v)     An order forbidding the Defendants from engaging in further unlawful conduct in violation of the Eighth Amendment to the United States Constitution;

(vi)    An award of actual, real, and/or statutory damages for the Defendants' conduct;

(vii)   Reasonable attorney's fees and costs incurred herein to the extent allowable by law;

(viii)  Pre- and post-judgment interest, as provided by law;

(ix)    Payment of a reasonable service award to the Plaintiffs, in recognition of the services they have rendered and will continue to render to Class Members, and the risks they have taken and will take; and

(x)     Such other and further equitable relief, including nominal damages, as this Court deems necessary, just, and proper.

## JURY DEMAND

116.    Plaintiffs demand a jury trial.

Dated: January 5, 2023
      New York, New York

Respectfully submitted,

**GUPTA WESSLER PLLC**

By: */s/ Peter Romer-Friedman*
    Peter Romer-Friedman

Peter Romer-Friedman
2001 K Street, NW
Suite 850 North
Washington, DC 20006
Tel: (202) 888-1741
Fax: (202) 888-7792
Email: peter@guptawessler.com

**MOBILIZATION FOR JUSTICE, INC.**

By: */s/ Belinda Luu*
    Belinda Luu

Michael N. Litrownik
Bernadette Jentsch
Belinda Luu
100 William Street, 6th Floor
New York, NY 10038
Tel: (212) 417-3866
Fax: (212) 417-3890
Email: bluu@mfjlegal.org

**POLLOCK COHEN LLP**

By: */s/ Christopher K. Leung*
    Christopher K. Leung

Christopher K. Leung
111 Broadway, Suite 1804
New York, NY 10006
Tel: (917) 9853995
Email: chris@pollockcohen.com

*Attorneys for Plaintiffs and the Proposed Class*